T.C. Memo. 2000-3


UNITED STATES TAX COURT


ESTATE OF WILLIAM BUSCH, DECEASED,
MARY DANA, EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16441-97.          Filed January 5, 2000.


Nickolas P. Tooliatos II and Erin Kvistad (specially recognized), for petitioner.

Elizabeth L. Groenewegen and Rebecca T. Hill, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined that there should be an increase in the reported value of certain real property resulting in a $1,974,500 Federal estate tax deficiency. Petitioner disagrees with respondent's value determination and

also contends that the value reported on the estate tax return was overstated and that the estate should be entitled to a refund due to an overpayment of estate tax. We consider here the fair market value of the realty and the applicability and/or amount of any fractional discount.

FINDINGS OF FACT[1]

William Busch (decedent) a resident of California, died on February 26, 1993, at the age of 98. The executor and personal representative of the estate, Mary E. Dana, resided in California at the time the petition was filed. In a timely filed estate tax return, decedent's one-half interest in 90.74 acres of real property (Busch property) was reported at a value of $3,810,000. The reported value was based on an appraisal report prepared by DeVoe & Associates (DeVoe), which was attached to the estate tax return. DeVoe, based on comparables of residential development properties, concluded that the fair market value for the entire fee simple interest was $12,700,000 and discounted, by 40 percent, decedent's one-half interest ($6,350,000) to arrive at the $3,810,000 return value.

Based on the amounts that had been reported by the estate, respondent assessed $1,674,465 in estate taxes. The estate paid $300,000 with the estate's extension to file, and an additional $75,000 was paid after respondent assessed the tax based on the

---

[1] The parties' stipulation of facts and exhibits are incorporated by this reference.

return, leaving an unpaid balance in the assessed estate tax liability of $1,299,465. The estate requested and received extensions of time within which to pay estate tax under section 6161.[2] After examination of the estate tax return, respondent determined that the fair market value of decedent's one-half interest in the Busch property was $7,400,000, or $3,590,000 greater than the amount reported by the estate.

The Busch property was improved by three dwelling units and farm equipment storage facilities. Decedent was born in 1894 and resided on the property throughout his life. Decedent originally coowned the property with his brother, but at the time of decedent's death, his coowner was a trust established by Velma Busch (decedent's sister-in-law) who was then 97 years old. Velma Busch died during October 1996. Prior to his death, decedent and his coowner(s) were generally not interested in selling the property. Decedent left his one-half interest in the Busch property to Mary and Eugene Dana, decedent's niece and her husband.

The Busch property was located in unincorporated Alameda County, adjoining the city of Pleasanton. Historically, the property had been used for agricultural purposes and was so zoned by Alameda County. Alameda County had a 100-acre agricultural

---

[2] All section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

property minimum and had denied a 1982 request to split the Busch property into two separate agricultural use parcels. Although the Busch property was not within Pleasanton's city limits, it was within its sphere of influence, and future development would be dependent upon annexation into Pleasanton. Under Pleasanton's General Plan in effect February 1993, most of the Busch property was designated as medium density residential and a small portion was designated high density residential. The Busch property originally included 25 additional acres on its western side that were sold and used for agricultural purposes and, ultimately, the 25 acres were developed into a mixed residential neighborhood.

During 1986, a 16.66-acre portion of the Busch property was sold to Pleasanton for use as a maintenance and operations facility for $1,718,620 or approximately $103,000 per acre. During 1987, the Pleasanton School District made an offer to purchase approximately 20 acres of the Busch property for about $100,000 per acre. During 1993 the School District was again looking for a future (1995-96) school site. In an internal school district 1991 planning document it was recommended that a 21.5-acre parcel of the Busch property be considered, and it was estimated that the value was $250,000 per acre. The school district normally hires a consultant to provide a fair market value of land in which the district has an interest. In 1993, the school district was also looking for a maintenance and operations facility. In connection with its search for a site,

the School District was provided a $175,000-per-acre estimate of the value for the Busch property.

After decedent's death in February 1993, the estate fiduciary began consideration of the development of the Busch property. In March 1993, the fiduciary's legal counsel, who was experienced in processing land through the entitlement process, contacted a civil engineer to report on the potential use of the Busch property for a residential subdivision. The engineer submitted a draft preliminary site analysis on July 3, 1993. The draft outlined the challenges and difficulties that could be encountered in development, including the evolving political climate in Pleasanton. A final report was submitted during August 1993.

During January 1994, the fiduciary's legal counsel sent nine letters to potential purchasers of the Busch property, inviting their inquiries. Eight of the letter recipients were involved in residential subdivision and/or development. The ninth letter was sent to a local church's site committee that had expressed an interest in the Busch property. The counsel had discussions with the school district and several of the developers concerning the sale of the property. Four of the developers sent letters indicating an intent to buy or option, and of their interest in acquiring the Busch property. Because the envisioned transaction would be one where the buyer/developer would essentially become a partner of the estate, the fiduciary's legal counsel sought to

find a match with a developer that understood the politics of Pleasanton and the entitlement process. He recommended that the offer of Ponderosa Homes (Ponderosa) be accepted.

By a February 25, 1994, letter, Ponderosa presented a letter of intent to option the Busch property for 36 months or 60 months after governmental approval, for an exercise price of $12,275,000 or $139,500 per acre (using 88 acres as the base). Ponderosa offered $5 million down and $7,275,000 due in two equal payments, one due in 18 months and the other due 30 months after escrow. Ponderosa agreed to pay a nonrefundable $10,000 per month for its option until the sale closed, with no crediting of these payments to the final price.

Ponderosa, with about 25 years of residential development experience, had 75 employees, 6 to 10 active projects, and began 1 to 2 new projects each year. In its business history, Ponderosa experienced only a few projects that it was forced to abandon. As of January 1994, Ponderosa had built about 1,000 homes in the Pleasanton area and was familiar with the city's entitlement process. Ponderosa was aware of the referendum against other projects (the Kottinger Hills project and controversy surrounding the Pleasanton Ridge development), and the political climate in Pleasanton, but Ponderosa believed that the Busch property project could work and bid on it.

In addition to the option agreement by Ponderosa, several other developers made offers as follows: (a) Mission Peaks Homes

offered to purchase for approximately $17 million, but the final price would depend upon the number of residential lots approved for building; (b) Braddock & Logan offered $150,000 per acre; (c) Greystone Homes considered dividing into 5 parcels, each consisting of about 18 acres. After negotiations with several developers, a two-stage closing was offered to Ponderosa, under which 44 acres would close in 36 months, and 44 acres would close no more than 60 months from the date of the agreement. It was expected that Pleasanton would scrutinize any development plans for Busch property and that necessary approval would take as long as 2 to 3 years. The offers from developers, including the one from Ponderosa, were not to be closed in less than 90 days and anticipated that the property would be approved by Pleasanton for residential development.

On June 30, 1994, the coowners of Busch property entered into an Agreement of Purchase and Sale with Ponderosa, at a base price of $150,000 per acre. After the coowners of Busch property each retained a 1-acre building lot, the remaining property was to be broken into two portions, approximately 44 acres each, and delineated as the "Dana Property" (Dana portion) and the "Busch Property" (Busch portion). The agreement was designed to provide for separate closing for each portion, with the Busch portion closing last. The purchase price was variable depending on time and/or the number of building lots approved. The price was to increase 9 percent annually from the first closing to either the

second closing or June 30, 2000, whichever occurred first. The per lot price was also to increase $50,000 for each dwelling lot approved in excess of 250 with 616 dwelling units stated as the outside limit. Accordingly, the combined 88-acre price could vary from a low of $13,200,000 to a high of $31,500,000. In addition to the purchase price, Ponderosa paid $100,000 down and was to pay $10,000 per month with respect to the Dana portion, and the payments were to stop at the time of the first closing with no credit being allowed against the purchase price. With respect to the Busch portion, Ponderosa was to pay $5,000 every 30 days beginning after the first closing until the earliest of the date of the second closing or June 30, 2000. The $5,000 payments were to be applied to the purchase price.

The parties to the June 30 agreement expected that the first closing (to occur no later than June 30, 1997) would complete the transfer of the Dana portion and the second closing (to occur no later than December 30, 2000) would complete the transfer of the Busch portion. The parties were also aware that the necessary approval for development would take time and money, and Ponderosa expected to spend up to $250,000 in seeking approval to develop. Ponderosa had estimated that on a "fast-track" basis, the entitlement process would take 18 months. Ponderosa's practice was not to make an outright purchase but to option an interest in property for development. At the time of the June 30 agreement, the parties were aware that the Pleasanton city government and

the political environment were less receptive to residential development than it had been during the 1980's.

As of 1993, the Pleasanton mayor and two members of a five-member city council had taken a strong stance against further development and intended to, at very least, slow growth in Pleasanton.  As an example, the Kottinger Hills project had been approved for development in late 1992, but surrounding homeowners petitioned for a referendum with respect to impact on local automobile traffic.  In January 1993, the referendum was placed on the November 1993 local ballot, and the Kottinger Hills project failed to receive sufficient votes, causing the project to be discontinued.  In addition, as of June 1992, the Pleasanton citizenry had also defeated the Pleasanton Ridge project by means of a ballot initiative.  When the June 1994 agreement was executed and as of decedent's date of death, it was foreseeable that difficulties could be encountered in gaining approval for property development within the sphere of influence of Pleasanton.

As of 1994, Pleasanton had maintained the same General Plan that had been in effect since 1986.  During 1994, Pleasanton was updating its General Plan, and at a March 1994 meeting, a Pleasanton's Planning Department employee indicated that the preferred number of lots for the Busch property was 375 or less. In April 1995, Ponderosa submitted a plan for 449 units on the Busch property.  During 1995, Pleasanton's General Plan Steering

Committee approved a plan for 391 housing units on the Busch property. In 1997, in the face of neighborhood concerns about traffic patterns, the Planning Commission approved 360 housing units for the Busch property. In addition, a neighborhood committee (by a 7 to 1 vote) agreed to a plan for the Busch property containing 300 housing units.

Just prior to the June 30, 1997, closing date, the parties revised their agreement and entered into an Amended and Restated Agreement of Option to Purchase, which was effective June 1, 1997, and, accordingly, no closing occurred under the original option agreement. Under the amended agreement, the $150,000 per-acre base price and the $50,000 per unit in excess of 250 units remained the same. The amended agreement provided for a "Price Escalator" under which the purchase price for the Dana or Busch portions would increase by $25,000 per month, beginning June 30, 1997, until the date of the first closing, scheduled for no later than January 5, 1998. The first closing under the amended agreement did not occur, and Ponderosa renewed the option agreement in March 1998.

Ponderosa presented a 360-unit site plan to the Pleasanton Planning Commission and received approval around the end of 1996. In early 1997, Ponderosa went to the city council, but it was not until December 2, 1997, that a 300-unit plan was adopted, and it was determined that the plan would not have significant adverse effects on the environment. On December 16, 1997, the city

council approved the prezoning of Busch property to a "Planned Unit Development--Medium Density Residential" and approved a 300-unit plan for development, conditional upon meeting numerous requirements involving design and home siting, architectural features, landscaping, construction of park, noise attenuation, building code compliance, creating a homeowners' association, fire code compliance, street construction, grading and drainage improvements, utilities and related matters. Ponderosa also agreed to provide Pleasanton 5-1/2 acres for use as a city corporation yard.

After approval of the plan, local citizens circulated a petition calling for a referendum involving traffic issues. In response to citizen concerns, Ponderosa disseminated materials attempting to show community benefits that would inure if the project went through. During January 1998 the referendum petition was filed, and the Pleasanton city council, with Ponderosa's approval, instead of addressing the question of a referendum or other alternative, decided to rescind the ordinance approving the Busch property plan.

Thereafter, a second amended agreement was entered into and became effective February 18, 1998. It called for an additional $375,000 increase to the purchase price and increased the $50,000 per unit over 250 unit amount to $70,000 per unit. The Purchase Price Escalator was increased from $25,000 to $30,000 from February 18 until the closing. The second amended agreement had

a single February 17, 2001, closing date.  Ponderosa, through
this time, had paid nonrefundable payments (that were not to be
applied to the purchase price) to the Busch property owners
ranging from about $500,000 to about $1 million.  As of the end
of 1998, approval had not yet been received, and Ponderosa
continued to experience difficulties in the process of attempting
to gain approval for development.

OPINION

This case involves the valuation of real property for estate
tax purposes.  We must decide the value of decedent's one-half
interest in the subject property.  The estate reported a fee
simple value of $12,700,000 and discounted decedent's one-half
interest ($6,350,000) by 40 percent to reach the $3,810,000 value
reported as includable in the gross estate.  The estate's
valuation was predicated on the assumption that residential
development is the highest and best use for the property.
Respondent, after examining the estate's return, valued
decedent's one-half interest in the property at $7,400,000, also
assuming that residential development is the highest and best use
of the property.  In the context of litigation, petitioner now
contends that decedent's interest in the property should have
been valued and included in the gross estate at $680,000.[3]

---

[3] We have held that a higher reported value is an admission,
requiring an estate to produce "cogent proof that the reported
values were erroneous."  Estate of Hall v. Commissioner, 92 T.C.
(continued...)

Petitioner argues that the value should be reduced because, as of the valuation date, it was unlikely that the property had the potential to be approved for residential development.

The parties disagree about how to handle the fact that approval for residential development had not been obtained and the probative weight, if any, that should be given to the terms of the June 1994 agreement. Although the June 1994 agreement was executed sufficiently close in time to the February 1993 date of death to be considered, it does not involve a contemporaneous payment of the contract proceeds. The agreement calls for payments at closings that would occur as much as 3 and 6 years in the future.

Petitioner contends that the $150,000 per-acre agreement price was wholly contingent and dependent upon whether the developer (buyer) was able to obtain entitlement to subdivide the property for residential development; i.e., that Ponderosa was not a willing buyer of unapproved land. Conversely, respondent contends that the agreement is a contract for sale with a delayed closing and that the contract price represents what a willing buyer would be willing to pay in a cash or contemporaneous transaction, irrespective of whether the entitlements were to be obtained later.

---

[3](...continued)
312, 337-338 (1989).

Property includable in a decedent's gross estate is to be returned at its fair market value generally as of the date of decedent's death. See sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Estate of Heckscher v. Commissioner, 63 T.C. 485, 490 (1975); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2501-1, Gift Tax Regs. The willing seller and buyer are hypothetical rather than specific individuals or entities. See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981).

The issue is factual and to be resolved from all the evidence and is, in great part, a question of judgment rather than mathematics. See Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Duncan Indus., Inc. v. Commissioner, 73 T.C. 266 (1979). The parties, in support of their positions, have relied on their expert witnesses' reports concerning the subject real estate. In making our determination we may embrace or reject expert testimony if, in our judgment, either approach is appropriate. See Helvering v. National Grocery Co., 304 U.S. 282 (1938); Sammons v. Commissioner, 838 F.2d 330 (9th Cir. 1988). If an expert's opinion is of no

assistance to the Court, it will be given little weight.  See
Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

In litigation, the parties have used different approaches to
valuing the real property.  Petitioner's expert used comparables
to provide a cash sale price of land for residential development
properties.  Petitioner's expert then applied substantial
discounts (as much as 80 percent), reducing an average of the
comparable sales to a proposed value of $25,000 per acre.
Petitioner's trial expert's $25,000 value is $114,500 less than
the $139,500-per-acre value that had been reported on the
estate's tax return.  Respondent's expert was asked to derive a
per-acre value based on the June 1994 agreement.  After reaching
a value based on the agreement, he discounted it to account for
the delay in the closing of the transaction.  Respondent uses the
resulting value as an actual and comparable sale price for the
Busch property.  Although the two approaches reached disparate
results, both are sourced in traditional cash sale principles
involving the use of comparables and may be reconciled.

In addition to the experts called by the parties for trial,
we must consider petitioner's appraiser's report attached to the
estate tax return.  We find analysis of that estate tax return
appraisal necessary because its per-acre value ($139,500) is more
closely allied with contract price ($150,000) and respondent's
determination.  In addition, the $139,500 value is substantially

in excess of the $25,000-per-acre value now advocated by petitioner.

Petitioner employed DeVoe, an appraiser, to ascertain the value of decedent's interest in the Busch property for purposes of reporting it on the estate's tax return. DeVoe's report was attached to the estate tax return and employed what he described as a "Market Data Approach" to value the property. That same approach has also been described as a comparable sales approach and involves the collecting of information on comparable and generally contemporaneous sales of like property in the general locale of the subject property.

DeVoe relied on nine sales with per-acre prices ranging from $21,612 to $445,872. One of the sales referenced by DeVoe was the 1986 sale of 16.66 acres of the Busch property to Pleasanton for $103,158 per acre. In five of the nine sales, the approval to develop had been obtained and the per-acre price ranged from $152,439 to $445,872. In one situation, partial development approval had been obtained and the per-acre price (based on full acreage even though all of it was not usable) was $53,043. The remaining two sales, for $21,612 and $29,520 per acre, concerned situations where no approval for development had been obtained. Other than the 1986 sale of the 16.66-acre Busch parcel, the sales used by DeVoe occurred during the period April 1989 through May 1993.

DeVoe refined his sales data universe to arrive at a per-acre range of $103,158 to $152,439.  DeVoe relied on comparable values of properties that had been approved for development arriving at a $139,500 per-acre value.  DeVoe's approach was based on the premise that residential development would be the highest and best use and did not contain a discount for the fact that the Busch property had not been approved for development as of the valuation date.  Applying the $139,500 value times 90.74 acres, DeVoe calculated a $12,700,000 value, which he divided in half to represent decedent's partial interest.  Finally, DeVoe applied a 40-percent partial ownership discount to arrive at the $3,810,000 value reported as part of decedent's gross estate.

Petitioner's trial expert, Norman Hulberg (Hulberg), like DeVoe, concluded that Busch property should be valued by means of the comparable sales method.  Hulberg opined that the property's highest and best use was to develop it as residential property.  Although Hulberg reached a $25,000-per-acre value, sometime during November 1997 (prior to reaching the $25,000 value), he had opined that the Busch property was worth $100,000 per acre.  During cross-examination, Hulberg explained that the decrease in the values he determined was attributable to facts that occurred both prior to and after November 1997 and that he had become aware of only after his November 1997 opinion.  Hulberg's explanation was without specificity and did not adequately explain the reduction.  We surmise that, in great part, Hulberg's

reduction was based on his changed view that the property would not likely have been approved for development as residential property.

Hulberg's opinion contained references to four Pleasanton area sales during the period June 1992 through December 1993 with a per-acre price range of $80,071 to $245,701.  The sales he chose occurred prior to the June 1994 agreement, and the transaction concerning the Busch property was accordingly not factored into Hulberg's analysis.  He then employed substantial discounts that he attributed to a lack of development approval and the political climate or conditions that may affect the possibility of approval.  Hulberg compared the Busch property with situations where unimproved land was discounted by as much as 80 percent for lack of development approval and concluded that a 60-percent discount[4] should be used with respect to the Busch property.  Included in Hulberg's analysis, and presumably his discounts, were adjustments for the time the land would be on the market prior to sale.  Hulberg opined that the Busch property had a $25,000 per-acre value.

Applying the $25,000 per-acre value to the 90 plus acres and rounding off, Hulberg arrived at a $2,270,000 gross value.  After a lengthy discussion of various discount concepts, Hulberg

---

[4] The range of per-acre values after the decreases appears to reflect reductions in value ranging from 60 percent to 80 percent.

settled on the same discount employed by DeVoe (40 percent) and thereby concluded that decedent's one-half interest in the Busch property at the time of his death had a $680,000 value. ($2,270,000 x .50 (half interest) x .40 (discount) = $680,000(rounded down)).

Steven Geller (Geller), respondent's expert, was hired to analyze the agreement between the Busch property owners and Ponderosa and determine the per-acre value based on that agreement. After reaching a value based on the agreement, he discounted that value to reflect the time value of the delay that was expected to be encountered in the closing process. Geller's approach was further limited to one of two fixed scenarios: One approach was to assume a closing of the entire property during June 1997 and the other was to assume two separate closings, one-half of the property during June 1997 and the other one-half during June 2000. Geller reached the conclusion that 360 units would be paid for at the closing(s) based on the Pleasanton Planning Commission's January 1997 approval of 360 units, a fact that was not known as of June 1994 or February 1993.

Using the $150,000-per-acre contract price, with an additional $50,000 times 110 units over 250 (360 - 250 = 110), Geller arrived at gross values of $19,271,000 and $22,225,895 for the single and dual closing models, respectively. Using a 9-percent discount rate to account for the passage of time until the closings, Geller concluded that the present value of the

Busch property as of the June 1994 agreement date was $15 million, irrespective of whether a single or dual closing occurred. Geller's approach was an attempt at reaching a present value of the June 1994 agreement. By using a present value technique, Geller acknowledges that the June 1994 agreement was not a cash sale. Respondent relies on Geller's value as reflecting an actual and/or comparable sale that supports respondent's value determination in the deficiency notice. Respondent directs our attention to the fact that Geller's $15 million value is slightly in excess of the gross value determined in the deficiency notice. It does not appear that respondent discounted for the fact that decedent held a partial interest.

Both parties used acceptable methodologies for valuing the subject property. Although the methodology was appropriate, we do not agree with all of the techniques, modifications, and/or discounts that were used to affect the ultimate proposed values. Hulberg, petitioner's expert, begins with comparables for residential development property and, by means of extremely large discounts, reduces the comparable to $25,000 per acre. In this way, Hulberg advances a value for the Busch property that, essentially, represents a value for unimproved farmland. Hulberg expressed the view that the highest and best use of the Busch property was for residential development and that comparable sales provide the best method to value unimproved land. He then effectively voided those views by using extraordinary discounts

for what he thought was the likely possibility that there would be no approval for residential development. Hulberg's conclusion that residential development would not be approved was a fact that was not known or reasonably foreseen on the valuation date or at the time of the execution of the June 1994 agreement. It also ignores the fact that the Busch property was actively pursued by Ponderosa and other knowledgeable developers who placed a value far in excess of $25,000 on the property. We do not accept Hulberg's $25,000 opinion of value and find his approach to be nothing more than a disguised attempt to circumvent and ignore the highest and best use of the property at the time of valuation and to thereby value it as farmland.

Petitioner's advocacy of the $25,000-per-acre value also ignores the fact that the Busch property abutted the city of Pleasanton and was adjacent to fully developed residential property. More importantly, petitioner did not deal with the fact that several developers were eager to develop the Busch property. In order to accept petitioner's/Hulberg's approach, we would have to conclude that Ponderosa (and the other developers who were interested in the property) were either unaware of or did not fully consider the difficulties that could have been encountered in obtaining approval of the property for development into residential property. Other developers offered $150,000 per

acre and $17 million.[5]  The fact that Ponderosa failed to obtain development approval approximately 4 years later was a fact that was not known to the parties to the June 1994 agreement.  If Ponderosa had known or thought that approval was not forthcoming, it would not have committed its resources and substantial capital to the Busch property project.  Also, as noted above, other developers expected that the property could be developed.  In that regard, Ponderosa paid an amount approximating petitioner's proposed net value ($680,000) in expenses pursuing development approval and in payments made to keep the June 1994 agreement open for development at a $150,000 plus per-acre contract price.

The June 1994 agreement price of $150,000 per acre represents a cash sale price between a willing buyer and willing seller.  The June 1994 agreement, however, did not require Ponderosa to pay "cash on the barrel head".  The agreement and trial testimony make it clear that both sides were aware of the foreseeable risks and the difficulties connected with obtaining approval for residential development.  The political climate in Pleasanton was also well known to the parties to the June 1994 agreement.  The comparable sales prices used by petitioner's appraiser for estate tax purposes and by its trial expert reflect that the $150,000-per-acre price was reasonable when compared with similar properties susceptible of residential development.

---

[5] The $17 million bid was dependent upon the number of building lots approved.

Petitioner, by emphasizing what actually happened (especially in the 1997-98 timeframe), sought to show that it was unlikely that the property would be approved for development as residential property within the city of Pleasanton. We cannot, however, attribute to a 1993 or 1994 buyer or seller these unforeseen facts that occurred several years later--in this instance, 3 to 4 years later. Nor can we allow such facts to bear on value unless those facts could be foreseen, known, and would have influenced a willing buyer and seller. See United States v. Cartwright, 411 U.S. 546 (1973). For purposes of this case, the statute mandates a date-of-death fair market valuation. See sec. 2031(a). The determination of value is to be made as of the valuation date (i.e., date of death), and knowledge of unforeseeable future events that may have affected the value cannot be attributed to the hypothetical buyer or seller. See sec. 20.2031-1(b), Estate Tax Regs.

We find the 1994 agreement to be sufficiently contemporaneous to represent a benchmark value for the subject property, and it comports with comparable sales. As of decedent's death, it was likely that the Busch property would be sold for and/or developed as residential property. The 1994 agreement represents the usual type agreement entered into by Ponderosa and other developers. In that regard, both of petitioner's experts (DeVoe and Hulberg) used comparable sales that comport in price per acre with the price in the June 1994

agreement and that occurred within the time period surrounding the date of death and the June 1994 agreement.[6] Petitioner's appraiser for estate tax purposes valued the property as development property. The estate included a discounted (for the partial interest) value that was based on its development as residential property. At the time its offer was made and accepted, Ponderosa was generally aware of the political conditions and possible problems that could be encountered in obtaining approval for development of the Busch property. Likewise, the sellers had consulted several sources of expertise and were aware of the value of their property and had the opportunity to choose from several different firms that were interested in a development type agreement. Petitioner and respondent agree that the "highest and best use" of the Busch property was residential development. The property physically abutted Pleasanton and existing residential housing. There was contiguous street access to the existing residential areas within

---

[6] DeVoe's comparables are set forth in the body of this opinion. The four sales Hulberg offered as comparables had prices ranging from $80,071 to $245,701 per acre. A simple average of the four sales referenced in Hulberg's report is $145,559. Hulberg, however, discounted the four sale prices by as much as 80 percent to reflect his view of the inability to obtain approval from the city of Pleasanton for residential development, causing the range to drop to $16,014 through $73,710. Accordingly, there is sufficient corroborative evidence to accept the $150,000-per-acre price from the June 1994 agreement as a starting point for our consideration of the fair market value.

the city of Pleasanton. At the time of decedent's death, other Pleasanton residential developments were in progress.

The record reflects that, at the time of decedent's death, the climate for residential development in Pleasanton was weakening, and, to that extent, we agree with petitioner that the price that a willing buyer would offer to a willing seller would be affected. See, e.g., Estate of Ratcliffe v. Commissioner, T.C. Memo. 1992-305. Any such price differential, however, would normally have been accounted for in Ponderosa's offer and the acceptance of same. Ponderosa's offer, in effect, was not to pay $150,000 per acre at the time the agreement was made, and it was contingent on acquiring approval to develop from Pleasanton. Ponderosa, aware of the risks, was willing to invest its money and time in pursuing development. In that regard, Ponderosa expended between $500,000 and $1 million in the form of payments to the sellers and expenses in pursuing the entitlements for residential development.

In order to adjust for the passage of time in connection with the difficulties expected in obtaining development approval, we must decide upon an appropriate discount rate to adjust the $150,000-per-acre cash price. Respondent's expert used a present value approach to account for the delay in payment. Respondent's expert, however, applied the discount to a gross value inflated by attributing an optimum approval of 360 housing units. Geller started with the $150,000-per-acre contract price and added

$50,000 for each unit he expected to be approved in excess of 250. Geller's computation of the $50,000 amounts for excess units was chosen based on the 1997 planning board approval for 360 units.[7]

We do not use the 360 housing unit approval figure because it was not foreseeable by the parties to the June 1994 agreement or as of the date of decedent's death. Considering property set asides for streets, utilities, and unusable portions, 250 units seems a reasonable estimate for a base figure. In addition, the parties to the June 1994 agreement used 250 as their base amount and provided for premium increases to the price to be paid only if approval for more than 250 units occurred. Normally a cash price is not discounted for the passage of time in the context of a fair market valuation as of a date certain. It would be appropriate, however, to discount the cash price here due to the expected time delay in obtaining approval for development.[8] We note that the parties anticipated that the contract price should

---

[7] In addition to the $50,000 excess unit amounts, Geller factored in the $10,000 and $5,000 amounts, but we do not consider those part of the contract price because they appear to be payments to maintain the seller's rights and to compensate the buyer for keeping the property under contract. To some extent, those amounts address the question of time value and, accordingly, it would be duplicative to make them a part of the contract price or present value computation.

[8] We assume that Ponderosa would not have entered into this contract unless it expected to gain approval, and any risk that approval would not be obtained was de minimis or remote.

be increased by about 9 percent per annum, and so they used a 9-percent factor.

Accepting a $150,000 cash per-acre value, the 90.74 acres would produce a $13,611,000 gross value.  We accept the 9-percent discount rate and apply it to the agreement's contemplated two closings, to wit:  no later than 3 and 6 years from June 1994. These closing dates represented outside limits, and the closings could possibly have occurred earlier.  It was estimated that, as of June 1994, the entitlement process would, on a fast track, take about 1-1/2 years and, at the outside, 3 to 4 years.  We use the 3- and 6-year dates (the limits of the June 1994 agreement) to account for the lapse of time until payment and account for the 1 year and several months by which the date of death preceded the June 1994 agreement.  Because of the known difficulties expected to be encountered in the approval process, it is also reasonable to use the 3- and 6-year closing dates and discount one-half of the contract price to account for a 3-year delay and the other to account for a 6-year delay.  Using a 9-percent discount rate, we hold that the present value of the $13,611,000 contract price would be $9,312,992 (present value of one-half of $13,611,000 at 9 percent for a 3-year period ($5,255,095) and one-half of $13,611,000 at 9 percent for a 6-year period ($4,057,897)).

As a final matter, we consider the appropriate fractional discount, if any, that should be applied to decedent's one-half

of the $9,312,992 present value of the Busch property at the time of decedent's death. The need for employing a discount is dependent on whether decedent's partial interest would have an effect on marketability. See generally Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982); Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981). Petitioner bears the burden of showing that a discount is appropriate and the amount of any such discount. See Rule 142(a); Estate of Van Horne v. Commissioner, 78 T.C. 728 (1982), affd. 720 F.2d 1114 (9th Cir. 1983).

Both of petitioner's appraisers selected a 40-percent discount to adjust the value to account for decedent's one-half ownership in the Busch property. Petitioner argues that the expertise they have offered and respondent's failure to provide expertise to address this point should result in the Court's adopting a 40-percent discount. Petitioner also makes the argument that partition was not a viable option because of the 1982 experience of the Busch property owners in failing to obtain a division of the property into less than a 100-acre parcel for agricultural purposes.

Respondent counters that the highest and best use of the property was residential development, and the estate and its coowner chose to sell the entire property to a single purchaser. Respondent also notes that among the sales offered as comparables by petitioner's experts some smaller parcels appeared to be no

less valuable than larger ones. In addition, respondent contends that the growth management policies of Pleasanton might make approval more easily obtainable for a smaller parcel. Respondent also maintains that the Busch property was homogeneous, and, physically, it could be easily divided or partitioned. Respondent also contends that it is not axiomatic, as petitioner seems to argue, that any partial interest must be discounted. Finally, respondent contends that petitioner has not met the burden of showing the need for a discount and/or the size of any such discount.

The circumstances of this case call for some discount attributable to the fact that decedent held a partial interest. In that regard, decedent's one-half interest was an equal interest with that of his coowner, and the property owned was capable of development for residential purposes as two separate 45-acre parcels. Petitioner points out that during 1982 the coowners were not permitted to divide the property into two separate farms, but it was the county's 100-acre minimum agricultural use limitation that was the reason for the county's denial. No such acre limitation has been shown to exist for residential property. We agree with respondent's analysis that the proposed comparables reflect little premium or discount for the size of the parcel to be developed and that it might have been beneficial to have a relatively smaller parcel, considering Pleasanton's growth management policies.

We do not accept respondent's argument that no discount should be employed because the coowners were cooperative and jointly sought to find a buyer for the Busch property. That is a matter of conjecture, and if a buyer purchased decedent's one-half interest, there is no showing here that decedent's sister-in-law's trust would have cooperated with any coowner, including decedent's estate. More significantly, the coowners' intentions were discernable as of the date of decedent's death. It was obvious that the owners and/or heirs to the Busch property were not interested in continuing its agricultural use. Accordingly, we conclude that some discount for the partial interest is called for; the question that remains is the size of that discount.

DeVoe's partial interest discount was based on five of the nine comparable sales and ranged from 18.8 percent to 45 percent. Two of the five involved 50-percent interests, and they had discounts ranging from 27.5 percent to 45 percent. DeVoe concluded that those two sales showed that a large fractional interest resulted in a larger discount, and he concluded that a 40-percent discount was appropriate. DeVoe, however, did not explain what aspects of the two sales relied on were comparable to the circumstances we consider involving the Busch property.

Hulberg discussed several factors in also arriving at a 40-percent discount for the fractional interest decedent held in the Busch property. First, he explained that a fractional interest reflected a lack of control. Although decedent's interest was

not a majority interest, his coowner's interest was equal, and so neither had a majority or minority.  As a result, neither had control, and both were equal.  Hulberg has treated the coownership of real property here as though the coowners were in a partnership relationship, thereby elevating the question of control.  It does not appear that the coowners operated a business (farming or otherwise) as partners, and, accordingly, control is less relevant.  This is a common interest in undivided and unimproved property, and the question to consider is the feasability of dividing the property in the case of disagreement about its use.  In that regard, costs of partition or other legal controversy, along with other factors, are considerations rationally involved in the valuing of an asset.  See Estate of Bonner v. United States, 84 F.3d 196, 197 (5th Cir. 1996).

Hulberg opined that partition was feasible under California law, but that the "ability to partition the property would not substantially decrease the discount presented by partnership sales, as such actions could involve a great deal of expense and delay prior to the liquidation of [a] co-tenancy interest."  We cannot accept Hulberg's premise as a universal principle because it ignores economies of scale and the relative value of the property.  For example, assuming a legal cost for partition of $200,000,[9] a $680,000 parcel (as Hulberg opined) might fit the

---

[9] Two hundred thousand dollars, assuming a $200 hourly legal
(continued...)

above-quoted principle.  A parcel, one-half of which had a value of $3 million to $4 million, would easily bear a $200,000 partition cost.  In addition, as of decedent's death, his coowner's share was held in trust for the 97-year-old widow of the former owner, and neither owner was a resident-farmer at that time.  The beneficial owners were the heirs of the owner/farmers who were not actively farming the property.  Those circumstances, known at the time of  decedent's death, make it less likely that partition would be necessary.  That is especially so where great disparity exists between the values of the land when comparing its use for agricultural and residential purposes.

Hulberg used a conglomeration of four different approaches to arrive at the amount of discount he used to account for decedent's partial interest.  First, he discussed a "Company Survey Method", which Hulberg described as a "survey of companies in the business of purchasing and selling partnerships."  Our review of Hulberg's analysis indicates that the partnerships involved were dissimilar to the Busch property situation.  The information was derived from the purchase and sale of general partnership interests, a format different from the Busch property ownership, which was simply a coownership in real property with no partnership business or operational type activity.

---

[9](...continued)
fee rate, represents 1,000 hours to accomplish partition.

Accordingly, the discount percentages represented by that type of transaction are inapposite.

Next, Hulberg addressed what he called the "Fractional Discounting Method".  That method was set out in an April 1992 journal article, Davidson, "Fractional Interests in Real Estate Limited Partnerships, The Appraisal Journal, Apr. 1992, at 184-194, in which 10 factors were used to analyze the amount of a fractional interest discount.  The factors employed, include: "Relative risk of the assets held, Historical consistency of distributions, Condition of the assets, Market's growth potential, Portfolio diversification, Strength of management." Those factors, to which Hulberg assigned values to arrive at an estimated 41-percent discount, appear to be the type of factors that are used in analyzing a going partnership business and not the simple coownership of raw land.  The remaining four factors address the control aspects, or lack thereof, of a fractional or partial interest.  Of the cumulative 41-percent discount reached by Hulberg, only 12 percent of it was attributable to the lack of marketability/control factors.  The remaining factors depended heavily on the fact that the entity was a going partnership (income sources, etc.) and would, therefore, not be applicable to measure the partial interest discount in this case.

Next, Hulberg used a "REIT Survey Method" that "involves an analysis of discounts found in real estate investment trust (REIT's)."  Hulberg indicated that the average discount was 39

percent with a range from 30 percent to 40 percent.  Here, again, Hulberg's explanation reflected that REIT's are operating real estate partnerships that are dissimilar from the simple coownership of realty that we consider.  The REIT is an entity in which investors purchase a percentage as an investor in the activity or business operation in which the REIT is involved.  Accordingly, the REIT-based approach to calculate a discount is not appropriate.

Finally, Hulberg referred to his four proposed comparable sales that he admits "are not highly similar to the subject property but they do indicate discounts are being taken by the [purchasers] of * * * fractional interests, and that there is a market for partial interests in a property."  The range of discounts was 29 percent to 41 percent.  The sales selected by Hulberg included a produce terminal, undeveloped unapproved land, an office building, and ranchland.  The undeveloped unapproved land was described as "Standard Oil Pond Grizzly Island (Solano Co.)", and Hulberg explained that the property was valued at $800,000 for a fee and a 25-percent interest was sold for $130,000.  No further information is provided, and it is not apparent that this property is comparable or how the $800,000 and $130,000 values relate to each other.  Accordingly, we do not find these examples to be helpful.

Hulberg then proceeded to conclude that the various referenced approaches resulted in discounts approximating 40

percent and that 40 percent is therefore appropriate. Hulberg, in addition to addressing the lack of approval for residential development, factored in the lapse of time in arriving at a 40-percent discount rate. We did not find any of Hulberg's approaches to be fitting or appropriate to the situation we consider, although we agree that some discount would be appropriate. In summary, Hulberg first discounted by as much as 80 percent, and then discounted the resulting amount by an additional 41 percent reflecting various factors, including lack of control, passage of time, and factors that would only be relevant in the consideration of a going partnership.

On the other hand, DeVoe, petitioner's appraiser who was used to provide a value for the estate tax return, started with a $137,500-per-acre value and discounted it by 40 percent to account for the partial interest. That approach resulted in a $3,810,000 value's being reported on the estate tax return. We have concluded that the per acre cash value is $150,000 and have discounted that amount to account for the passage of time and, to some extent, for the risk associated with the possibility that approval for development might not be obtained. That discount resulted in reducing the value of decedent's one-half interest from $6,805,500 ($150,000 x 90.74 x .50) to $4,656,496 (see present value computations, supra, p. 28) or a reduction of 31.6 percent. Based on our evaluation of the evidence, it appears that DeVoe's valuation appraisal was conservatively performed

favoring decedent's estate. We reach that conclusion because he used a per acre value at the lower ranges of the true comparables and a discount rate at the highest end of the spectrum when considering the facts in our record.

A smaller partial interest discount than used by petitioner's appraisers would be appropriate in the circumstances of this case. As already noted, as of decedent's death, there were no owners or potential owners who, like decedent and his deceased brother/coowner were solely interested in farming the land. The heirs of both owners were interested in selling or developing the land in light of the substantial difference in its value for that use. At the date of decedent's death, his coowner was a trust for a 97-year-old woman, and there was no doubt that the highest value of the land was as residential property. Under these circumstances a 10-percent discount would be sufficient to account for the partial interest represented by a simple coownership in unimproved land. As already discussed, 10 percent would also be more than adequate to accommodate reasonable costs of partition (10 percent of the rounded one-half interest ($4,660,000) or $466,000) in the event that either set of heirs of the then-current coowners might not be interested in selling the property for its highest and best use (residential development).[10]

---

[10] The use of a 10-percent discount for the partial interest
(continued...)

We accordingly hold that the fair market value of decedent's one-half interest in the Busch property at his date of death is $4,190,496 ($9,312,992 x .50 = $4,656,496 - $466,000 = $4,190,496).[11]

To reflect the foregoing,

Decision will be entered under

Rule 155.

---

[10](...continued) results in an overall discount from the $150,000 value for decedent's one-half interest of 38.4 percent.

[11] Because we have held that the fair market value that should have been included in decedent's gross estate exceeds the amount reported by the estate, it is not necessary to consider respondent's contention that we are without jurisdiction, in the circumstances of this case, to decide an overpayment in estate tax.