T.C. Memo. 2003-66

UNITED STATES TAX COURT

ESTATE OF NATALIE M. LEICHTER, DECEASED, STEVEN
LEICHTER, CO-SPECIAL ADMINISTRATOR AND JEFFREY L.
LEICHTER, CO-SPECIAL ADMINISTRATOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2192-00.                    Filed March 6, 2003.

<u>Walter Joseph Tribbey III</u>, for petitioner.

<u>David R. Jojola</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a $344,635 Federal

estate tax deficiency for the Estate of Natalie M. Leichter (the

estate).  This deficiency derives from respondent's determination

that the fair market value of Harlee International, Inc., a

closely held corporation, was $2,718,358 instead of the

$2,091,750 reported as its fair market value on the estate's tax return.  The sole issue for our consideration is the fair market value of Harlee International, Inc., on October 23, 1995, the date of decedent's death.

## FINDINGS OF FACT[1]

Decedent Natalie Leichter was a resident of Los Angeles, California, at the time of her death on October 23, 1995. Decedent's spouse, Harvey A. Leichter, died approximately 3 months earlier during July 1995.  Decedent died testate and was survived by two sons, Jeffrey L. Leichter and Steven F. Leichter. Steven Leichter resided in Walnut, California, at the time the estate's petition was filed.  Among other things, the estate included all of the outstanding common stock of Harlee International, Inc. (Harlee).

At the time of decedent's death, Harlee was a California corporation which had elected S corporation status for Federal tax purposes.  Harlee had 20,000 shares outstanding and was a wholesale distributor of futon frames.  Harlee was founded in 1981 by Harvey Leichter.  It began as a small importer and distributor of industrial fasteners imported from Asia. Initially, Harlee operated out of the Leichter residence.  In the mid-1980s, Harlee entered into the business of the wholesale

---

[1] The parties' stipulations of facts are incorporated herein by this reference.

distribution of waterbed frames and vinyl liners.  After a decline in the waterbed market and approximately 1½ years before his death, Harvey Leichter became involved in the re-emerging futon market.

Through his overseas contacts, Harvey Leichter sought out Asian companies that could manufacture futon frames according to photographs and samples provided by Harlee.  Harlee dealt directly with representatives who, in turn, were responsible for locating foreign companies and maintaining accounts with them. Harlee did not have contractual relationships with the Asian manufacturers.  Shortly before decedent's death, Harlee's contractual relationship with two representatives ended:  One manufacturer was taken over by Harlee's competitor, and another was closed as a result of embezzlement.

As of decedent's date of death, Harlee was still in a period of transition from the waterbed to the futon market.  Harlee's product line consisted of approximately 60-percent futon-related items and 40-percent waterbed-related items.  Of Harlee's futon products line, nearly 10 percent were metal fastener and liner products manufactured in Taiwan.  The remaining 90 percent were futon frames from three different manufacturers in Indonesia.

The use of Asian suppliers kept costs low but subjected Harlee to concerns such as: (1) A 3-to-4 month order, or lead time; (2) additional delays during the Asian rainy season; (3) the possibility of political unrest that stopped and/or substantially decreased production; and (4) approximately 20 percent defective inventory. For these reasons, Harlee maintained at least 3 to 4 months of inventory at all times. However, during two of Harlee's biggest seasons, Christmas and spring, which coincide with the Asian rainy season, inventory was increased beyond the 3 to 4 months standard. Harlee was increasing its inventory at the time of decedent's death.

At the time of decedent's death, Harlee conducted business from leased premises in Corona, California. Because the building had become too small for Harlee's needs and the lease was about to expire, Harlee leased new premises beginning on January 1, 1996.

Harlee was exposed to competition by similarly sized companies on a national level. Its customer base consisted of approximately 100 customers, including retail stores, distributors and manufacturers. Although most of the customers were retail stores, the distributors generated the largest amount of revenue. Once a distributor became sufficiently large enough to import products directly, it would cut out the middleman, such as Harlee. Sometimes Harlee remained involved as an agent for

the distributors and received a 3- to 5-percent commission, instead of the normal 30-percent profit. Due to a large turnover, Harlee continually needed to, and did, generate new customers.

Prior to his death in July 1995, Harvey Leichter was Harlee's president and primary salesman, generating 80 to 90 percent of all sales. Decedent was Harlee's bookkeeper. Aside from them, the management team consisted of James Woll, general manager in charge of new product development; and James Seltzer, assistant to the president. Altogether, Harlee had a workforce consisting of 8 to 10 employees. Between Harvey Leichter's death in July 1995 and decedent's death in October of that same year, the workforce remained constant except that decedent became president.

For the 4 years preceding decedent's death (1991 through 1994), Harlee had total sales of $2,426,721, $1,896,895, $2,778,872, and $3,894,587, respectively. In each of the 2 years preceding death, Harlee's sales increased more than 40 percent from the prior year. For that same period, Harlee's cost of goods sold averaged in the mid-to-high 70-percent range in relation to total sales, and its operating expenses averaged approximately 18 percent of total sales. Harlee's adjusted net income for the 4 years preceding decedent's death was generally increasing, as follows: $40,194, $83,640, $77,570, and $113,191.

Similarly, for Federal tax purposes, Harlee reported generally increasing amounts of ordinary income culminating in $163,121 for its 1994 taxable year.

Steven Leichter worked for 13 years at Harlee until decedent fired him in June 1994. Consequently, he was not involved with Harlee for the approximately 12 to 15 months preceding his parents' deaths. Steven Leichter returned to Harlee shortly after decedent's death and assumed responsibility for the day-to-day operations. Jeffrey Leichter resided in Detroit Lakes, Minnesota, at the time of decedent's death.

Jeffrey Leichter was nominated in decedent's will to act as her executor and, as such, was issued letters of special administration on November 2, 1995. On the same date, the estate filed a petition seeking to probate the March 21, 1995, will and the October 16, 1995, First Codicil. In her First Codicil, decedent disinherited her son, Steven Leichter. Consequently, a dispute arose between the two sons concerning the distribution of the estate. In particular the dispute concerned decedent's predeceased spouse's estate and the First Restatement of the January 12, 1991, Leichter Family Trust.

On March 6, 1996, a Settlement Agreement and Mutual Release (Settlement Agreement) was filed with the probate court reflecting that a settlement had been reached between Jeffrey and

Steven Leichter.  Among other things, the Settlement Agreement

provided that

> 1.5 * * * the Trust shall distribute to
> Steven * * *
> > a.  One hundred percent (100%) of the
> > stock in Harlee * * *  [20,000
> > shares];
> > b.  the sum of $400,000.0 in
> > cash * * *
>
> 1.5 [sic.]  Steven shall assign his interest
> in * * * [decedent's] Individual Retirement
> Account to Jeffrey * * *
>
> 1.6  Steven shall also release any claims he
> may have for any portion of * * *
> [decedent's] estate * * *.

On March 20, 1996, the Superior Court appointed Joseph D.

Bua as probate referee to appraise and inventory the estate.  Mr.

Bua filed such appraisal and inventory of the estate with the

Superior Court on August 13, 1996.  The filed documents reflected

that the Harlee stock was inventoried and appraised at

$2,261,713.00.  Decedent's Individual Retirement Account was

valued for Federal estate tax purposes at $2,240,966.

On October 31 and December 16, 1996, the estate filed with

the Superior Court a Waiver of First and Final Account and a

First Supplement to the Waiver of First and Final Account,

respectively.  On December 17, 1996, the Superior Court ordered

that the outstanding stock in Harlee, appraised at $2,261,713,

was to be distributed to Steven Leichter.  On December 23, 1996,

Steven Leichter acknowledged receipt of the distribution of the Harlee stock.

On July 22, 1996, 1 day before the estate tax return was due, the estate requested a 6-month extension until January 23, 1997. The request was granted, and the estate's tax return was timely filed. The return reflected that the unit value of the 20,000 shares of Harlee, which represented all of the issued and outstanding stock, was $104.59, for a total value of $2,091,750. Because the value of Harlee stock exceeded 35 percent of the adjusted gross estate, the estate elected the section 6166(a)(1)[2] benefit of paying $722,421 of estate tax in installments over 10 years.

The $2,091,750 reported value stems from an appraisal report, dated November 15, 1995. It was prepared by Lawrence F. Sherman of WIN Corporate Finance, Inc., who was hired by the estate to value the business. In his valuation of Harlee (Sherman Appraisal), Mr. Sherman relied on Harlee's October 31, 1995, interim financial statement. This statement reflected that a $1,253,021 note payable by Harlee to the Leichter Family Trust had been converted to equity on or before decedent's date of death. The note payable had shown an annual interest rate of 10

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

percent, which was payable monthly. If the interest was not paid, the amount of interest became part of the principal and was compounded. The note payable had been secured by a security interest in substantially all of Harlee's assets and had been recorded by Harlee as a current liability.

Approximately 4 years later and during the examination of the estate's tax return, the estate's attorneys arranged a meeting with Mr. Sherman and senior management at Harlee to review and discuss the Sherman Appraisal. One week later, Mr. Sherman wrote a letter to one of the estate's representatives claiming that he had made an error on the Sherman Appraisal. He explained that "During * * * [the] meeting * * * last week, new information was presented to me that was not considered in * * * [the Sherman Appraisal] in 1995." Mr. Sherman stated that his error resulted from a misunderstanding as to inventory policy and existing liabilities.

A statutory notice of deficiency was issued to the estate on December 6, 1999.

OPINION

We consider here the fair market value of a closely held business and whether any discount is appropriate. The estate reported Harlee's fair market value at $2,091,750 based on an appraisal that was attached to its estate tax return. Respondent initially determined that the fair market value was $2,718,358 in

the statutory notice of deficiency.  Based on its expert's report, respondent, for purposes of trial, contends that the fair market value was $2,150,000.  The estate, for purposes of trial, contends that the appraisal relied upon for purposes of the estate tax return was erroneous or flawed and that the fair market value is, at most, $800,000.  At trial, both sides to this controversy offered witnesses supporting their respective positions.

Property includable in a decedent's gross estate is generally included at its fair market value on the date of death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs.  Fair market value is a factual determination, and the trier of fact must weigh all relevant evidence of value and draw appropriate references.  Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Natl. Grocery Co., 304 U.S. 282, 294 (1938); Symington v. Commissioner, 87 T.C. 892, 896 (1986).

To determine the value of an unlisted stock, an actual arm's-length sale of a similar stock within a reasonable time before or after decedent's date of death is indicative of its fair market value.  Ward v. Commissioner, 87 T.C. 78, 101 (1986). In the absence of arm's-length sales, fair market value represents the price that a hypothetical willing buyer would pay a hypothetical willing seller, both persons having reasonable knowledge of all relevant facts and neither person compelled to

buy or sell. Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989). It is implicit that the buyer and seller would aim to maximize profit and/or minimize cost in the setting of a hypothetical sale. Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). Therefore, we consider the view of both the hypothetical seller and buyer. Kolom v. Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C. 235 (1978).

In this case, the estate reported Harlee's value to be $2,091,750 on its estate tax return. For purposes of this controversy, the estate contends that the value is, at most, less than one-half of the amount it reported. A valuation amount reported on a taxpayer's return is a deemed admission. Estate of Hall v. Commissioner, supra at 337-338.

The estate argues that the Sherman Appraisal, upon which the estate relied in filing its 1995 estate tax return, was erroneous. Specifically, the estate contends that the appraisal by Mr. Sherman: (1) Inferred, mistakenly, that he had interviewed the decedent; (2) stated, alternatively in different paragraphs on the same page, that the estate to be valued was of Mrs. Lee Leichter or of Mr. Harvey Leichter; (3) reported that decedent's date of death was October 18, 1995, when it was October 23, 1995; (4) determined that the working capital was excessive without

considering the nature of the business; and (5) did not take into account $90,000 of liabilities.

We note that decedent and her husband died within a short time of each other. Furthermore, most of the errors complained of by the estate are orthographic. While they might reflect that Mr. Sherman's appraisal needed proofreading, they do not show that the value is erroneous.

As for the posited errors which appear to be more substantive in nature, again, they do not show that the value, itself, is erroneous. The purported $90,000 in liabilities was unknown and unforeseeable at the time of decedent's death and cannot be used for valuation purposes. See, e.g., Estate of Busch v. Commissioner, T.C. Memo. 2000-3. Furthermore, despite the estate's claim, it does not appear that Mr. Sherman overstated by $900,000 the amount of excess working capital. In fact, his valuation of excess working capital appears reasonable and was approximately $100,000 lower than that of respondent's expert.

Contrary to the estate's contentions, the record is replete with evidence that the value reported on the estate tax return was correct. For instance, in probate litigation between the decedent's two sons, Jeffrey and Steven Leichter settled the dispute based upon a $2,261,713 value of Harlee, determined by a probate referee, who was an independent party appointed by the

court.  Moreover, respondent's expert arrived at a value that was a mere $60,000 or 3 percent more than reported on the estate tax return.

In reaching our holding on the fair market value of Harlee, we consider the expert witnesses' reports.  It is within this Court's discretion to evaluate the cogency of their conclusions and opinions.  Sammons v. Commissioner, 838 F.2d 330, 333 (9th Cir. 1988), affg. on this point and revg. on another ground T.C. Memo. 1986-318.  This Court evaluates opinions of experts in light of each expert's demonstrated qualifications and the evidence in the record.  Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998) (and cases cited therein).  Accordingly, this Court may accept or reject all or part of an expert's opinion.  Id.

For purposes of supporting a substantially lower value than reported, the estate offered two experts, one valuing Harlee at $863,000 and the other at $400,000.  Respondent offered one expert, who valued Harlee at $2,150,000.  While neither party offered Mr. Sherman, who valued Harlee at $2,091,750 for purposes of the estate tax return, the Sherman Appraisal itself is part of the record.

Mr. Burdette Garvin was hired by the estate for litigation purposes and opined that the value of Harlee was $863,000 as of October 23, 1995.  Although Mr. Garvin seemed to have working

knowledge of the market for this type of business, his appraisal approach and methodology are weak in several respects. As an example, for adjusted book value, Mr. Garvin improperly included the $1,254,408 Note Payable. As of decedent's date of death, that Note Payable had already been converted to equity.[3] Consequently, it was not a liability of Harlee, and Mr. Garvin's adjusted book value should have been substantially larger.

In arriving at book value, Mr. Garvin increased other noncurrent liabilities by approximately $1,400,000 from October 31 to December 31, 1995. Mr. Garvin attributes this increase to something he denominates as "negative goodwill". Negative goodwill has been defined as a phenomenon which occurs when the purchase price of a business is less than its book value. See Adventist Living Ctrs., Inc. v. Bowen, 686 F. Supp. 680 (N.D. Ill. 1988), affd. 881 F.2d 1417 (7th Cir. 1989). In that regard, Mr. Garvin had already discounted Harlee's assets substantially for "soft" inventory and doubtful accounts. Moreover, he provided no viable reason for further reductions for "negative goodwill".

Mr. Garvin employed established valuation methodologies: Discounted earnings method, guideline company method, and industry market ratios method. However, he duplicated the

---

[3] While this point was conceded by the estate on brief, the estate did not address the change in book and adjusted book value amounts.

discounts applied.  For instance, he discounted for the loss of
Harvey Leichter in all three methods and after weighing all
three, he discounted again for lack of marketability.  We found
this to be an attempt to discount for the same reasons he
discounted the values initially.  For that reason among others,
we question whether his report can be relied upon.

Significantly, Mr. Garvin fails to explain his reasons for
not including a pure liquidation analysis as part of his report.
In effect, Mr. Garvin is opining that Harlee is worth
substantially less than its liquidation value.  He fails to
explain why the hypothetical seller would choose not to liquidate
when he concludes that the going concern value is less than the
value of its assets.[4]

Mr. John McCallum was hired by the estate for litigation
purposes and opined that the value of Harlee was $400,000 as of
December 31, 1995.  In reviewing Mr. McCallum's report, we find
that his conclusions and analysis are brief and cursory in
nature.  For instance, while acknowledging in the appraisal that
his date of valuation was 2 months after decedent's date of
death, Mr. McCallum merely states that "this date is
appropriate."  Mr. McCallum's "Observations as to Conditions" of
Harlee is less than 10 sentences.  Mr. McCallum provides no

---

[4] The estate points out that Steven Leichter wanted to
continue the family business and felt an obligation to the
employees.  However, we can only consider the motivations of a
hypothetical seller or buyer, not those of Steven Leichter.

explanation of the Leichters' role at Harlee in concluding that a 15-percent discount should be applied for the lack of continuity of management.  We accord no weight to Mr. McCallum's report because of the lack of adequate explanations in support of his conclusions.

Mr. John Thomson was hired by respondent for litigation purposes, and he opined that Harlee's value was $2,150,000 as of October 23, 1995--an amount less than respondent's original determination of $2,718,358.  Primarily, Mr. Thomson used two methods in arriving at his value.  Through the market approach, he compared Harlee to five publicly traded firms, discounted the value of Harlee to match more accurately the comparables to the subject and added both a 15-percent control premium and an excess working capital value of $900,000.  Through the income method, Mr. Thomson forecasted Harlee's sales for the subsequent 5 years and used a net discounted cashflow method to value those sales at present value.  In so doing, Mr. Thomson looked at Harlee's previous 5 years of operation and then discounted the future cashflow by 17 percent.

Mr. Thomson's methodology was within reasonable range and his conclusions were adequately supported by the facts in the record.  Mr. Thomson's $2,150,000 value was in harmony with the $2,261,713 value arrived at by the probate referee and the $2,091,750 value reported by the estate on its estate tax return.

However, we did find some weakness in his approach; i.e., the fact that he chose guideline companies that, even in his own opinion, were not similar to Harlee.

In arguing for a lower value of Harlee, the estate continually attempted to shift our focus to the rate of return expected by a hypothetical buyer of Harlee. However, we cannot, overlook the fact that a hypothetical seller would not sell Harlee valued as a going concern if a substantially larger amount could be realized by means of Harlee's liquidation. Further, Harlee had an established record of past earnings which belies the estate's position.

We hold that the includable value of Harlee on October 23, 1995, was $2,091,750, the value reported on the Estate of Natalie Leichter's estate tax return.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>